UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLES T. MCINTOSH

    Plaintiff,

v.                                               Case No. 09-C-1106

C.O. MALUEG and
NORB WENDRICKS,

    Defendants.

**MEMORANDUM AND ORDER**

Charles McIntosh, having been convicted in this court of conspiracy to distribute crack cocaine, is currently serving a federal sentence at F.C.I. Otisville. From February 15, 2007 to September 17, 2007, while his federal case was pending, McIntosh was held in custody in the Brown County Jail ("BCJ"), which houses federal pretrial detainees under an agreement with the United States Marshal Service. On November 30, 2009, McIntosh filed this pro se civil rights action pursuant to 42 U.S.C. § 1983, claiming that seven named and thirty unnamed defendants, all of whom are officers or employees of the BCJ, violated his constitutional rights while he was housed there. McIntosh was allowed to proceed against two defendants, Nurse Norb Wendricks and Correctional Officer ("CO") Ryan Malueg, on three claims. McIntosh alleged in his complaint that Wendricks and Malueg were deliberately indifferent to his serious medical needs when they collaborated to deny him prescribed pain medication following his testicular surgery. McIntosh additionally alleges that Wendricks demonstrated deliberate indifference to his medical needs by

denying him meals that met his diabetic needs, which exacerbated his diabetic condition, and by refusing to allow him to see an eye doctor.

The case is presently before the Court on the defendants' motion for summary judgment. For the reasons that follow, the motion will be granted in part and denied in part.

**ANALYSIS**

**I. Summary Judgment Standard**

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *McNeal v. Macht,* 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson,* 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court reviews the evidence in a light most favorable to McIntosh, the non-moving party; however, the Court will not accept conclusory allegations and pleadings if they are not supported by specific facts showing a genuine issue for trial. *Paul v. Theda Med. Ctr.,* 465 F.3d 790, 793-94 (7th Cir. Wis. 2006).

**II. Deliberate Indifference Standard**

To prove a claim of deliberate indifference, "a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008) (internal citation omitted). An inmate's subjective belief that a different course of action would have been preferable does not constitute sufficient evidence of deliberate indifference to survive summary judgment. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005). Even a difference of opinion between physicians is not enough to establish deliberate indifference. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Deliberate indifference requires more than negligence; it requires that the official both knew of and disregarded an excessive risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834–37(1994). Subjective knowledge of the risk is required: "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id*. at 838.

Although the Eighth Amendment does not apply to pretrial detainees, as a pretrial detainee McIntosh was entitled to at least the same protection against deliberate indifference to his basic

3

needs under the Fourteenth Amendment as is available to convicted prisoners under the Eighth Amendment. *See Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) (citation omitted). With these principles in mind, I now turn to the claims asserted by the plaintiff.

**III. Denial of Pain Medication**

McIntosh's first claim is that he was denied his prescribed pain medication while at the BCJ. (Compl. ¶¶ 4–6.) McIntosh underwent surgery on his testicles at St. Vincent Hospital on April 19, 2007. Specifically, Dr. Daniel DeGroot performed bilateral hydrocelectomy on him. A hydrocele testis is the abnormal accumulation of fluids around a testicle. A hydrocelectomy is a surgical procedure to remove the fluid from around a testicle. McIntosh underwent a bilateral hydrocelectomy, meaning surgery was performed on his scrotum and both testicles because they were grossly enlarged due to the accumulation of fluid. (PFOF ¶¶ 81–82.) Following the surgery, Dr. DeGroot prescribed one to two Vicodin tablets every four hours as needed for pain, and an antibiotic, Keflex (cephalexin), one tablet, three times a day, for seven days. The prescription called for a total of 35 Vicodin tablets with no refills. (PFOF ¶¶ 83, 86.)

McIntosh was discharged from the hospital and returned to BCJ on April 21, 2007. He alleged in his complaint that BCJ had a policy of dispensing medication to inmates three times per day: 5:00 a.m., 12:00 p.m., and 5:00 p.m. (Compl. ¶ 3.) Based on this policy, McIntosh alleged that BCJ refused to give him his pain medication at bedtime. As a result, he alleged that was unable to sleep at night for weeks because the medication he took at 5:00 p.m. wore off by around 9:00 p.m., and he "experienced serious twings [sic] of pain in his penis every time he moved in his sleep." (*Id.* at ¶ 5.) McIntosh further alleged in his complaint that Officer Malueg was one of the guards that

4

usually worked on the unit on which he was housed at BCJ, and that on many occasions between April 2007 and September 2007, CO Malueg, in collaboration with Nurse Wendricks, refused to give him his pain medication at 9:00 p.m. McIntosh alleges he "repeatedly informed medical supervisors, nurse Norb Wendricks, CO Malueg, Lt.'s Office, Cpt. Jadin, and BCJ Administration, Medical supervisors" that he was prescribed the pain medication specifically to relieve the pain in order to allow him to sleep through the night without severe pain. (*Id.* at ¶ 6.) McIntosh's allegation has some support in the record. On April 27, 2007, McIntosh filed a grievance in which he states that CO Malueg denied his request for medication at 9:00 p.m. on April 26, 2007. The grievance states that McIntosh informed CO Malueg that he had just had surgery "on his penis" and needed his medication so he could sleep. (ECF 26, Pl.'s Resp. to Def.'s Interrog. at BCJ042.) The grievance further stated that CO Malueg refused McIntosh's request, stating that he and Nurse Wendricks had agreed that McIntosh was not supposed to get medications after 5:00 p.m. McIntosh claims he told CO Malueg that he was in severe pain at night and that Malueg said he didn't care. Malueg also denied his request for a corporal. (*Id.*)

CO Malueg's notes confirm he denied McIntosh's request for Vicodin at 9:00 p.m. on April 26, 2007. Malueg's notes state he informed McIntosh that according to his med sheet, McIntosh was only allowed to get Vicodin at 5:00 a.m., 12:00 p.m., and 5:00 p.m., as needed. When McIntosh informed CO Malueg that other officers had been giving Vicodin to him at 9:00 p.m., Malueg again told him that his med sheet clearly states when he is allowed to receive Vicodin. Malueg states McIntosh was not happy with his answer and wanted him to call the nurse. Malueg states he called Nurse Wendricks, and Nurse Wendricks confirmed that McIntosh was allowed to

5

have his Vicodin at the three med times listed above and no other times. (Malueg Aff. ¶¶ 8–10, Ex. A.)

It appears that the jail staff had incorrectly recorded McIntosh's Vicodin prescription information on his med sheet. Instead of indicating he was to be given one or two tablets every four hours as needed as Dr. DeGroot had prescribed, McIntosh's medication record states that he was to receive Vicodin three times a day. (Wendricks Aff., Ex. O at BJC 094.) But the defendants do not even acknowledge the inaccuracy; nor do they offer any explanation for it. It even appears that the jail may have had a policy at the time that prohibited inmates from receiving prescription pain medication other than at the three set times referred to above.

Nevertheless, the defendants argue that even if they erred in not giving McIntosh his medication on April 26, 2007, they are entitled to summary judgment on McIntosh's denial of medication claim because McIntosh has failed to produce any evidence regarding when he was allegedly denied Vicodin and BCJ records reflect only the denial on that one occasion. In response to the grievance he filed over the incident, McIntosh was advised, "If this occurs in the future refer to your on duty CO and let him know the level of pain and they will follow up with HSU [Health Services Unit]." (Pl.'s Ans. To Def.'s Interrog. at BCJ 039.) Defendants argue that despite this advice, there is no evidence that McIntosh made any further requests for Vicodin after 5:00 p.m. In fact, the record shows that while McIntosh submitted 26 Inmate Request for Medical/Dental/Psychiatric Care forms from the time he entered BCJ on February 15, 2007, until his surgery on April 19, 2007, he filed no Requests for medical assistance to deal with his pain after April 26, 2007, except for a May 5 and May 9 Request that his Vicodin prescription be refilled, which was done by the BCJ on May 11, 2007. (PFOF ¶¶ 106-113.) And McIntosh filed no other

6

grievances over the denial of prescription medication. In addition, the defendants point out, the medication sheets show that McIntosh did not ask for Vicodin at night or at bedtime on any other day. (PFOF ¶¶ 103, 115.)

Furthermore, aside from this one incident, defendants highlight that several facts indicate Wendricks and Malueg were otherwise attentive to McIntosh's medical needs. McIntosh was provided Vicodin on a daily basis two to three times a day from the date he returned to the jail from his surgery, on April 21, 2007, until his prescription ran out on May 5. (Wendricks Aff. ¶ 45, Exs. O, P, Q.) On May 5, McIntosh filled out a medical care request form in which he asked for another prescription for Vicodin, although the prescription on his discharge sheet from the hospital stated that no refills were to be given. (*Id.* ¶¶ 39, 57.) Nurse Wendricks accommodated McIntosh by allowing him ibuprofen, which was administered to him on a daily basis from May 6 to May 11. (*Id.*) On May 10, Nurse Wendricks went further; he personally saw McIntosh, removed his sutures, gave him antibiotic ointment and pads to change his dressing, and prescribed him a refill of Vicodin, one tablet to be taken three times a day as needed. (*Id.* ¶ 59, Ex. E.) The following day, on May 11, 2007, McIntosh began receiving Vicodin three times a day through May 20, 2007, when his prescription from Wendricks ran out. (*Id.* ¶¶ 60–61.) He never received Vicodin at bedtime between May 11 and 20, and never complained to Nurse Wendricks or Malueg that he requested, but was refused, Vicodin at night during this time. (*Id.* ¶ 62.)

Pain due to the withholding of medication can constitute a serious medical need. *See West v. Millen*, 79 Fed. Appx. 190, 193 (7th Cir. 2003). The defendants understandably question whether a single missed dose of Vicodin can constitute deliberate indifference. *See Zentmyer v. Kendall County,* 220 F.3d 805 (7th Cir. 2000) (holding that the failure to give an inmate five out of thirty

7

prescribed pills according to schedule was not deliberate indifference); *see also Mayweather v. Foti,* 958 F.2d 91, 95 (5th Cir. 1992) (deficiencies in prison medical system are minimal where prison officials only occasionally miss a dose of medication for plaintiff-inmate), *Holms v. Sheahan*, 930 F.2d 1196, 1201–02 (7th Cir. 1991) (inmate who was forced to wait eight months for medication for a painful skin condition did not have a colorable § 1983 claim). But McIntosh claims he was denied pain medication not just once but throughout the weeks following his surgery. Defendants are correct that their records do not show that McIntosh continued to complain. However, he alleged that he repeatedly complained in his verified complaint and has objected to Defendants' proposed findings of fact on that basis. Given his status as a pro se litigant, I conclude that he has sufficiently alleged the denial of medication to raise an issue of fact as to whether it rises to a constitutional violation. While the defendants offer a number of strong arguments regarding McIntosh's credibility and damages, these questions are for the jury and cannot be appropriately resolved on summary judgment. *See Ralston v. McGovern*, 167 F.3d 1160 (7th Cir. 1999)(reversing and remanding summary judgment for a state prison guard's refusal to render medical treatment). McIntosh has raised genuine issues of material fact with respect to this claim; Defendants' motion for summary judgment with respect to McIntosh's alleged denial of pain medication is accordingly denied.

Furthermore, upon review of the record and the oral arguments before the court on August 17, 2011, I am convinced that a genuine issue of material fact remains with respect to whether the denial of pain medication reflected a policy of the BCJ. The portion of the order dismissing Captain Jadin as a party (Docket 10) is thereby vacated and he is reinstated as a defendant along with Nurse Wendricks and Correctional Officer Malueg.

**IV. Alleged Denial of Diabetic Meals**

McIntosh is a diabetic with dietary restrictions. (Wendricks Aff. ¶ 9.) He alleges he told Wendricks he needed to eat "healthier food" and that the jail's normal fare made McIntosh's feet swell up. (Compl. ¶ ¶ 15–19.) He claims Wendricks did nothing to ensure that McIntosh was provided diabetic meals. (*Id.*) McIntosh claims the food he ate at the BCJ caused excessive weight gain and caused a spike in his blood-sugar levels, which has resulted in damage to his vision and nerves. (*Id.*) McIntosh alleges he informed Wendricks of his dietary requirements in May and June of 2007, but Wendricks did nothing to ensure that McIntosh received appropriate meals. (Compl. ¶ ¶ 17–18.)

The failure to provide a diabetic inmate with a special diet could amount to cruel and unusual punishment in some circumstances. *See Sellers v. Henman*, 41 F.3d 1100, 1102–03 (7th Cir. 1994). To prevail on his claim of deliberate indifference McIntosh has the burden of proving (1) Nurse Wendricks was aware of facts from which an inference could be drawn that a substantial risk of serious harm to McIntosh's health existed due to the food McIntosh was being provided and (2) Nurse Wendricks actually drew the inference but consciously disregarded the risk. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Pierson v. Hartley,* 391 F.3d 898, 902 (7th Cir. 2004).

While McIntosh's claim regarding his allegedly inadequate diet is specifically against Wendricks, he fails to mention Wendricks in any pleadings except his actual complaint. In his brief opposing summary judgment (ECF 66) he never argues that Wendricks was aware that the food McIntosh was being served presented a substantial risk of harm to McIntosh's health. He has submitted no affidavits in support of his diet-related allegations against Wendricks.

In stark contrast to McIntosh's unsupported allegations, Defendants have demonstrated through sworn affidavits that a special diabetic diet was designed for McIntosh by an ARAMARK registered dietitian. (Aff. of Darryl Markin, ECF 40 at ¶ ¶ 1–17.) McIntosh's confused response to the declaration merely alleges that the dietitian is a defendant whose own deliberate indifference deprived McIntosh of proper diabetic meals. (Plt.'s Objec. to Aff.of Darryl Martin, ECF 71 at 1–2.) The dietitian is not a defendant in this action and his affidavit is credible and uncontradicted.

On balance McIntosh has set forth no facts or arguments demonstrating any genuine issues of material fact related to his allegedly inadequate diet. He has submitted no affidavits based on personal knowledge. He has not attempted to refute any of the Defendants' facts in any manner authorized by Fed. R. Civ. P. 56. In contrast, Defendants have demonstrated in their motion and supporting materials, including the affidavits of Darryl Martin and Wendricks, that McIntosh was served a proper diabetic diet designed by a registered dietician. McIntosh has failed to refute these affidavits and they will be deemed undisputed. Fed. R. Civ. P. 56(2). McIntosh has not put forward any evidence that Wendricks demonstrated such a complete absence of professional judgment to the extent that no minimally competent professional would have responded in such a manner under the circumstances. *Collignon v. Milwaukee County,* 163 F.2d 982, 989 (7th Cir. 1998). Summary judgment is therefore proper as to McIntosh's claim that Wendricks was deliberately indifferent to his need for a diabetic diet.

**V. Alleged Denial of Vision Care**

Finally, McIntosh alleges on June 11, 2007 he informed Wendricks that he was having difficulty seeing, was experiencing blurriness, and had eye pain. (Compl. ¶ 23.) According to the

10

complaint, Wendricks denied McIntosh's request to see an eye doctor, apparently because federal authorities would not authorize sending him to visit an eye doctor, and there was no eye doctor at the jail. (Compl. ¶ ¶ 20, 22.) While at the initial screening stage of this litigation McIntosh's allegations were sufficient to state a claim of deliberate indifference against Wendricks regarding denial of medical treatment, Defendants have now submitted affidavits that contradict McIntosh's unsupported allegations.

The following facts relating to eye care are undisputed: In March and April of 2007 McIntosh told BCJ staff that he wore glasses but did not have them with him and needed a "loaner" pair (Wendricks Aff., ECF 38 ¶ 72, Ex. I.); on June 10, 2007, McIntosh submitted a medical care request regarding eye problems (*id.* ¶ 32, Ex. K.); Wendricks responded to McIntosh's June request and advised McIntosh that he would need to contact the U.S. Marshals service because the Marshal was the sole approval authority for eye care for federal inmates housed temporarily in a county jail (*id.*); the U.S. Marshal service was responsible for paying all of McIntosh's medical expenses while he was housed in the BCJ other than medical care provided by jail doctors and nurses. (Aff. of Phillip Steffen, ECF 39 at ¶ 14.) Wendricks provided McIntosh with the contact information for the appropriate U.S. Marshal (Wendricks Aff.¶ 32, Ex. K.); McIntosh submitted a grievance on June 17, 2007 in which he complained he had been without glasses since February 15, 2007. (Steffen Aff. ¶ 36, Ex. T.) There is no evidence that McIntosh made any requests for eye care after June 17, 2007; if McIntosh contacted the U.S. Marshal service it is unclear what action that agency took (*see* Resp. to Mot. for Sum. Jud., ECF 72 at 2) as McIntosh did not receive an eye exam while at the BCJ.

First, the need for glasses, especially reading glasses, is not per se a serious medical need. *See Borelli v. Askey,* 582 F. Supp. 512 (E.D. Pa., 1984); *c.f. Kemppainen v. Aransas County Det. Ctr.,* 2010 WL 4918958, *8 (S.D. Tex. Nov 23, 2010) (denying summary judgment where plaintiff was denied eyeglasses when plaintiff was nearsighted to the point of legal blindness and had suffered severe headaches and other pain and discomfort as a result of his uncorrected vision.) Serious medical needs include the following: "(1) conditions that are life-threatening or that carry risks of permanent serious impairment if left untreated; (2) those in which the deliberately indifferent withholding results in needless pain and suffering; and (3) conditions that have been diagnosed by a physician as mandating treatment." *Lilly v. Torhorst,* 2006 U.S. Dist. LEXIS 5670, *16 (W.D. Wis. 2006). Here, McIntosh's alleged visual impairment does not meet any of these criteria. McIntosh could see well enough to read and write and, moreover, McIntosh never followed up with any further complaints of eye problems after June 17, 2010.

Furthermore, even if McIntosh did have a serious medical need regarding his vision, Wendricks' response to McIntosh's June request to see an eye doctor was appropriate. By telling McIntosh to contact the U.S. Marshals Service, Wendricks did not act with deliberate indifference. The BCJ did not employ or contract with any eye care specialists to examine and treat inmates at the jail. (Steffen Aff. ¶ 16.) If a federal prisoner such as McIntosh wanted health care services that were not provided at the BCJ, such services had to be pre-approved by the U.S. Marshals Service, since the federal government was responsible for paying all such expenses. (*Id.* ¶ 15.) Wendricks, a mere nurse at the BCJ, did not have any authority over the U.S. Marshals Service and could not have sent McIntosh to an eye care specialist on Wendricks' own accord. Wendricks provided

McIntosh with prompt and accurate information about how to coordinate an eye appointment and such acts flatly contradict McIntosh's claim of deliberate indifference.

## CONCLUSION

The undisputed facts show that McIntosh was provided diabetic meals, and that he was provided contact information for the U.S. Marshal, the only person who could address his request for eye glasses. Such facts fail to give rise to any genuine issues of material fact related to McIntosh's deliberate indifference claims, making summary judgment with respect to these two claims proper. Defendants' motion for summary judgment for McIntosh's claims regarding his eye care and diabetes are accordingly **GRANTED**. However, a genuine issue of material fact still remains with respect to the denial of McIntosh's pain medication. Defendants' motion for summary judgment with respect to this claim is therefore **DENIED**. In accordance with McIntosh's demonstration of a genuine issue of material fact with respect to whether his denial of pain medication is the result of a BCJ policy, the portion of the order, Docket 10, dismissing Captain Jadin as a party is **VACATED**.

Dated this    22nd    day of August, 2011.

      s/ William C. Griesbach  
      William C. Griesbach  
      United States District Judge