# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHARLES T. MCINTOSH

        Plaintiff,

    v.                                          Case No. 09-C-1106

BROWN COUNTY, JOHN JADIN, JESSE VERDEGAN,
RYAN MALUEG, MISTY ANDERSON, PAM PAGE,
NORBERT WENDRICKS, MARK JENSON, and
JOHN AND JANE DOES,

        Defendants.

---

## DECISION AND ORDER

---

      This matter comes before the court on Defendants' motions for summary judgment. (ECF Nos. 174, 178 & 183.) Charles McIntosh is currently serving a federal sentence for conspiracy to distribute crack cocaine at F.C.I. Otisville in New York, but from February 15, 2007, to September 17, 2007, while his federal case was pending, McIntosh was held at the Brown County Jail (BCJ) in Green Bay, Wisconsin. McIntosh initially filed this § 1983 civil rights action *pro se* on November 30, 2009, alleging that seven named and thirty unnamed officers and employees of the BCJ violated his constitutional rights while he was housed there. In February 2012, with the assistance of court-appointed counsel, McIntosh proceeded to trial against three of the named officials: Jail Administrator John Jadin, Correctional Officer Ryan Malueg, and Nurse Norbert (Norb) Wendricks. He alleged that these officials were deliberately indifferent to his serious medical needs when they denied him prescription pain medication following his testicular surgery. On February 9, 2012, a jury found that neither Jadin, Malueg, or Wendricks acted with deliberate indifference to McIntosh's serious medical needs. (ECF No. 122.)

Following the jury verdict, the court granted McIntosh a new trial on the ground that it should have appointed counsel earlier to support McIntosh's efforts to conduct discovery and identify unnamed defendants. (ECF Nos. 135 & 137.) McIntosh was permitted to conduct additional discovery, and by his court-appointed attorneys, he filed an amended complaint on July 2, 2012. (ECF No. 138.) The amended complaint names Brown County and seven additional individuals as defendants: Captain John Jadin, Lieutenant Jesse Verdegan, Correctional Officer Misty Anderson, Correctional Officer Ryan Malueg, Nurse Norb Wendricks, Nurse Pam Page, and Dr. Mark Jenson. McIntosh alleges that the defendants collectively failed to provide him with pain medication as prescribed, stopped his medications for no reason and without instruction, and failed to provide him with adequate resources to prevent and treat a post-operation infection. He also contends that many of these unconstitutional acts were performed pursuant to an unwritten BCJ policy which only allowed inmates to receive medications at 5:00 a.m., 12:00 p.m., and 5:00 p.m. (the "5-12-5 Policy"), notwithstanding that McIntosh's surgeon prescribed Vicodin to be taken every four hours, as needed, including at the hour of sleep.

The defendants filed three separate motions for summary judgment. For the reasons provided below, the motion filed by Dr. Jenson will be denied, the motion filed by Nurses Wendricks and Page will be denied, and the motion filed by Brown County, John Jadin, and the correctional officers will be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

2

56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *McNeal v. Macht,* 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson,* 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court reviews the evidence in a light most favorable to McIntosh, the non-moving party; however, the Court will not accept conclusory allegations and pleadings if they are not supported by specific facts showing a genuine issue for trial. *Paul v. Theda Med. Ctr.,* 465 F.3d 790, 793-94 (7th Cir. 2006).

## II.  FACTUAL BACKGROUND

In 2007, health care was provided to BCJ inmates through the Health Services Unit (HSU), which was headed by Dr. Jenson, the HSU Medical Director.   (Pl's Proposed Findings of Facts

(PPFOF) ¶¶ 10-11, ECF No. 196.) The HSU staff was mainly comprised of Dr. Mark Jenson and approximately three to five nurses, including Nurses Wendricks and Page. (*Id.* ¶ 21.) McIntosh suffered from a number of medical ailments at the time of his arrest, including bilateral hydroceles, a condition that causes the scrotum to fill with fluid. He underwent an initial screening when he arrived at BCJ, and he saw Dr. Jenson, BCJ's medical director, on March 20, 2007. (*Id.* ¶¶ 9, 27.) Upon observing that McIntosh's scrotum measured six inches by six inches, Dr. Jenson ordered an ultrasound and recommended surgery. (*Id.* ¶ 27.) In a preoperative visit on April 6, 2007, Prevea Health urologist Dr. Daniel DeGroot prescribed Darvocet, a pain medication, to be taken every eight hours, as needed. The prescription included 30 pills with one refill. Dr. DeGroot also provided Preoperative Patient Instructions, in which he instructed that certain medications should be stopped prior to McIntosh's surgery. Darvocet was not listed as one of the medications that Dr. DeGroot indicated should be stopped. (*Id.* ¶¶ 34-37.)

Medications were distributed to BCJ inmates by correctional officers, who followed instructions contained in a "med sheet" prepared by HSU. Despite Dr. DeGroot's instructions, McIntosh encountered difficulties obtaining his medications in the following two weeks. From April 9 through April 12, McIntosh received Darvocet at 5:00 a.m., 12:00 p.m., and 5:00 p.m. On April 9, McIntosh submitted a request to HSU stating that he was denied his medication at 8:00 p.m. by a correctional officer. He wrote, "I need it at bedtime the most to sleep," and he asserted that it was prescribed "as needed" and that Dr. DeGroot intended for him to take the pain medication at night. Nurse Norb Wendricks responded to the request the following day, stating that inmates were only allowed to receive medications three times a day, at the hours of 5:00 a.m., 12:00 p.m., and 5:00 p.m. (*Id.* ¶¶ 42-43.) On the evening of April 10, McIntosh submitted another HSU request,

reporting that he did not receive his Darvocet again and had difficulty sleeping because of pain. Nurse Wendricks did not directly respond to his concern about getting pain medication at night. Instead, he responded: "You won't be receiving Proxy [aka Darvocet] anymore. We gave it to you but once the script runs we don't renew. You will have to use Tylenol or ibuprofen." (Blinka Decl., Ex. 16, ECF No. 198-11.) Although it appears that McIntosh's prescription should not have run out between April 6 and April 10, he was given non-prescription pain medication instead of Darvocet until his surgery on April 19. (PPFOF ¶ 54.)

Dr. DeGroot performed surgery on McIntosh's testicles at St. Vincent Hospital on April 19. McIntosh received a six-inch incision in his scrotum as a result of the surgery. Following the surgery, Dr. DeGroot completed three forms: (1) a prescription, (2) discharge instructions, and (3) a "Home Medication List." The prescription indicated that McIntosh should take one to two Vicodin tablets every four hours as needed for pain, and the discharge instructions listed Vicodin "as needed" for pain. On the Home Medication List, Dr. DeGroot again indicated that McIntosh could take one to two Vicodin tablets every four hours as needed for pain, and he also added the notation "qhs," which means "at hour of sleep." (*Id.* ¶¶ 57-61; Trial Tr., 61:22-25, 62:17-22, 64:14-16, 66:14-19, February 7, 2012, ECF No. 159.) McIntosh was discharged from the hospital and returned to BCJ on April 21, 2007. (*Id.* ¶ 65.)

McIntosh again requested his pain medication at bedtime, and from April 22 to April 24, correctional officers gave McIntosh his Vicodin at 12:00 p.m., 5:00 p.m., and 9:00 p.m. (PPFOF ¶ 66.) However, on April 26, Officer Ryan Maleug began working the night shift in McIntosh's pod. (*Id.* ¶ 69.) When McIntosh asked Officer Malueg if he could have his Vicodin at bedtime, Malueg informed him that according to his med sheet, he was only permitted to receive his Vicodin

at 5:00 a.m., 11:00 a.m., and 5:00 p.m., as needed. He also recorded in the Inmate Notebook that he contacted Nurse Wendricks, who informed him that "McIntosh is only allowed to get his vicodin at the three med times listed above as needed and no other times will he be allowed to get them." (Blinka Decl., Ex. 29, ECF No. 198-18.) McIntosh filed a grievance against Malueg on April 27, stating that he suffered severe pain at night and that Dr. DeGroot had prescribed his medication for bedtime. He also stated that he informed Malueg that he just had surgery and was still bleeding, swollen, and in severe pain, but Malueg stated he "did not care" and, in consultation with Nurse Wendricks, denied him Vicodin. (Blinka Decl., Ex. 30, ECF No. 198-19.)

McIntosh's grievance form was reviewed and declared unfounded by Officer Misty Anderson on May 7, 2007. (Blinka Decl., Ex. 31, ECF No. 198-20.) Officer Anderson noted that she spoke with "HSU Sarah" regarding McIntosh's medical issue. She then indicated: "It is up to you to let the officer know your level of pain and need for your medication. However, if an on duty nurse gives an order it is to be carried through by correctional staff. If this occurs in teh (sic) future refer to your on duty CO and let him know the level of pain and they will follow up with HSU." On appeal, Lt. Jesse Verdegan denied the grievance, stating: "The procedure of the Brown County Jail is med passes are at 5am, 12pm, and 5pm. These are not subject to change. The Dr.'s order says you get meds at 5pm not 9pm. There is nothing we can do to change this." (Blinka Decl., Ex. 32, ECF No. 198-21.) McIntosh also claims that from April 26 to April 30, he asked Officer Malueg for Vicodin every night at bedtime but was denied on each occasion. Officer Malueg denies that McIntosh made these requests, and no such requests were documented by any BCJ staff member. BCJ's records indicate that on these dates, McIntosh received Vicodin at 12:00 p.m. and 5:00 p.m. but did not ask for Vicodin at 5:00 a.m. (PPFOF ¶¶ 78-79.)

McIntosh's Vicodin ran out on May 5, and he submitted a request to HSU seeking an additional prescription. On May 9, requested Vicodin again, and in response, Nurse Wendricks contacted Dr. Jenson and arranged for a new Vicodin prescription. Dr. Jenson ordered a Vicodin prescription starting May 11 indicating that McIntosh could receive one tablet, three times a day, as needed. McIntosh received Vicodin at 5:00 a.m., 12:00 p.m., and 5:00 p.m. between May 11 and May 20. Between May 5 and May 10, McIntosh received ibuprofen. On May 17, McIntosh submitted a grievance against Nurse Wendricks, claiming that Nurse Wendricks had misidentified him on May 5 and gave his Vicodin to someone else. Nurse Pam Page, the managing nurse, responded to the grievance and informed McIntosh that he would be seeing Dr. Jenson shortly. (*Id.* ¶¶ 82-89.)

McIntosh saw Dr. Jenson again on May 22, and Dr. Jenson observed that McIntosh had an infection in the surgical wound as well as a yeast infection in his groin area. (*Id.* ¶ 90; Expert Report of Dr. Keith Ness, Sandfort Aff., Ex. J, ECF No. 177-10.) McIntosh was responsible for cleaning and dressing the surgical wound, and on several occasions he made requests for gauze, ointment, and pads. McIntosh contends that he did not receive enough of these items to change the dressing on his wound each day, and that as a result, his infection persisted into November 2007. (*Id.* ¶¶ 90-99.)

## III. ANALYSIS

McIntosh brings this action pursuant to 42 U.S.C. § 1983, which imposes liability on any "person" who, while acting under color of state law, deprives an individual of federally protected rights. All defendants apart from Brown County have been sued in their official and individual

capacities. An official capacity suit alleges that the defendant executed or implemented official policy or conduct. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Official capacity claims are brought against an individual's office rather than against the individual, and such claims are effectively suits against the government body which the individual represents. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). As a result, McIntosh's claim against the defendants in their official capacities will be treated as a claim against Brown County. *See Schmidling v. City of Chicago,* 1 F.3d 494, 495 n.1 (7th Cir. 1993) (explaining that duplicative official capacity claims can be dismissed) (citing *Kentucky*, 473 U.S. at 165-66)). By contrast, individual capacity claims "seek to impose liability upon a government officer for actions taken under color of state law." *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999). A state actor sued in his individual capacity may also assert personal immunity defenses. *Id.*

### A. Eighth Amendment Official Capacity Claims

As a government entity, Brown County may not become liable for the constitutional torts of its employees under a *respondeat superior* theory, but instead only when the employees' acts were themselves an extension of official policy. *Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 694 (1978). A local government entity is responsible under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.*

A plaintiff has three means of establishing municipal liability under *Monell*: (1) the plaintiff may establish the existence of "an express [municipal] policy that, when enforced, causes a constitutional deprivation;" (2) the plaintiff may prove "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to

constitute a custom or usage with the force of law" that causes a constitutional violation, or (3) the plaintiff may show that "the constitutional injury was caused by a person with final policymaking authority." *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997) (quoting *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995)). The policy must be the "moving force" behind the constitutional violation. *Id.*

McIntosh contends that BCJ had a policy of regularly dispensing medication to inmates only three times per day: 5:00 a.m., 12:00 p.m., and 5:00 p.m. (identified by McIntosh as the "5-12-5 Policy"), and that this policy caused jail officials to wholly ignore the "as needed" prescriptions written by Dr. DeGroot. (Pl's Br. in Opp. at 25, ECF No. 192.) McIntosh claims that this policy caused him to experience severe pain at night, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Hereinafter, the court's reference to the 5-12-5 Policy identifies an alleged BCJ policy in which nurses and officers did not have discretion to administer an "as needed" medication outside the 5-12-5 hours.

BCJ's formal written policy provided that inmates could receive "as needed" medications by submitting a General Request slip to the Housing Officer. The Housing Officer will then check the inmate's Medical Administration Record to see if the request is valid, and if it is, then the officer may administer a proper dose to the inmate. (Brown County's Resp. to Pl's Interrogatories at 8, Johnson Aff., Ex. B, ECF No. 184-3.) McIntosh argues that despite this written policy, the 5-12-5 Policy was created by an official policymaker and was the operative policy at BCJ. He bases his argument on the trial testimony of Captain Jadin, the jail administrator, who allegedly testified that either his predecessor or Dr. Jenson formulated the 5-12-5 policy in 2000 or 2001.

The court finds that McIntosh has misconstrued Jadin's testimony. On direct examination, Jadin testified that he was not aware of a policy in 2007 that inmates could only receive medications three times a day. (Trial Tr., 283:21-284:4, February 8, 2012, ECF No. 160.) On cross-examination, defense counsel asked the following hypothetical question: "[a]ssuming in 2007 there was at least a procedure at the Brown County Jail for delivering medications to inmates at 5:00 a.m. approximately and then around noon and again at 5:00 p.m. Did you have anything to do with creating that procedure?" (*Id.*, 289:19-24.) Jadin responded, "No," and then stated that his "assumption" would be that it was formulated by either his predecessor back in 2000/2001 or a medical director. (*Id.*, 289:24-290:3.) Thus, Jadin did not testify that any policymaking authority had enacted a 5-12-5 Policy.

Further, even assuming that Captain Jadin or Dr. Jenson had enforced the 5-12-5 Policy, McIntosh has not demonstrated that their decisions would constitute actions of a final policymaking authority. Whether an official is a "policymaker" in a particular area for purposes of § 1983 is a question of state or local law. *McMillian v. Monroe County,* 520 U.S. 781, 785 (1997) ("Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue."); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988)*.* The official's policymaking authority must be final in the sense that his decisions are not subject to review by a higher official or other authority. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011). The relevant inquiry here is whether Jadin or Dr. Jenson possessed ultimate authority to enact BCJ medication distribution policies.

As Jail Administrator, Captain Jadin was responsible for enforcing the policies of the Jail, addressing grievances that were filed, and overseeing jail operations. (Brown County et al. Proposed Findings of Fact ¶ 1, ECF No. 185.) Jadin contends, however, that he was not a policymaking authority for purposes of § 1983 because any new policy or procedure he created required the approval of the Brown County Sheriff. (PPFOF ¶ 47; Jadin Dep. 40:20-41:16, Johnson Aff., Ex. G, ECF No. 184-8.) McIntosh has not offered evidence to rebut this assertion.

In addition, McIntosh has not offered evidence that Dr. Jenson, as BCJ's medical director, possessed ultimate policymaking authority. Dr. Jenson's contract provided that he would "assist the [Brown County Sheriff's Department Jail Division] in developing and implementing policies and procedures that assure high quality health services." (Purchase of Service Contract § III, Blinka Decl., Ex. 39, ECF No. 198-39.) However, McIntosh does not offer evidence that the Brown County Sheriff's Department delegated any final policymaking authority to Dr. Jenson, s*ee Milestone*, 665 F.3d at 781, and Dr. Jenson testified that his only policy-related function was to occasionally review a policy to determine whether it was safe. (Jenson Dep. 19:16-23, Sandford Aff., Ex. A, ECF No. 177-1.) The evidence presented indicates that the Sheriff is the ultimate policymaking authority for medical policies at BCJ, and McIntosh has not offered evidence that the Sheriff established, enforced, or had any knowledge of the 5-12-5 Policy.

McIntosh must therefore establish that a strict 5-12-5 policy was the widespread practice at BCJ. The Seventh Circuit has cautioned that "widespread" must be taken seriously: to establish a widespread practice or custom, a plaintiff must "introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006)*; see also Jackson*

*v. Marion County,* 66 F.3d 151, 152 (7th Cir. 1995) (explaining that a plaintiff may show "a series of bad acts" and invite the court to infer from them that "the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers"). Although no specific number of "bad acts" establishes a custom, two or three is typically not enough. *See, e.g.*, *Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005) (finding that three instances of pepper-spraying did not establish a custom). Courts have also cautioned that it is more difficult, but not impossible, for a plaintiff to establish a municipal custom based solely on his own experience. *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (holding that plaintiff failed to establish a custom where he alleged that prison officers handed him a full bottle of prescription pain medication on four separate occasions).

McIntosh contends that a series of decisions by correctional officers and nurses demonstrate a widespread 5-12-5 Policy. McIntosh claims that he was denied "as needed" medication when he asked for it on at least seven nights, but here, the exact number of incidents is not the only relevant factor. McIntosh also alleges that on several occasions he was directly informed by defendants that he was being denied medication pursuant to a policy and that the policy did not allow for discretion. For example, in response to McIntosh's April 9 medical request, Nurse Norb Wendricks stated that "The (sic) only give Meds 3X a day here in the jail. Med times are 0500 - 12:00 - 5:00 PM." (Blinka Decl., Ex. 15, ECF No. 198-10.) Following surgery, McIntosh received Darvocet at bedtime from correctional officers on three consecutive nights, but Officer Malueg denied his request on April 26, stating that his med sheet only permitted him to receive Vicodin at 5:00 a.m., 11:00 a.m., and 5:00 p.m., as needed. (PPFOF ¶¶ 66, 69.) Officer Malueg also contacted Nurse

12

Wendricks, who informed him that "McIntosh is only allowed to get his vicodin at the three med times listed above as needed and no other times will he be allowed to get them." (Blinka Decl., Ex. 29, ECF No. 198-18.) McIntosh then submitted a grievance, which was reviewed and declared unfounded by Officer Anderson on May 7, 2007. On appeal, Lieutenant Verdegan unequivocally stated that "[t]he procedure of the Brown County Jail is med passes are at 5am, 12pm, and 5pm. These are not subject to change. The Dr.'s order says you get meds at 5pm not 9pm. There is nothing we can do to change this." (Blinka Decl., Ex. 32, ECF No. 198-21.)

In contrast to the statements above, Nurse Pam Page testified that although correctional officers in each housing pod typically handed out medications three times a day, the nurse assigned to the an inmate's pod could grant an exception for an "as needed" medication. (Dep. of Pam Page at 27:17-19, 28:1-17, Blinka Decl., Ex. E, ECF No. 198-42.) Nevertheless, McIntosh has presented evidence that on multiple occasions, defendants invoked a strict 5-12-5 Policy as their authority to deny him medication. He has also presented evidence that he attempted to inform officers, nurses, Dr. Jenson, and Captain Jadin that his prescription was "as needed" and that his medication was being denied pursuant to a policy. The court acknowledges the possibility that Nurse Wendricks, Officer Malueg, and Lieutenant Verdegan were not attempting to articulate a strict policy, and instead, were mistaken about Dr. DeGroot's instructions. Nurses Page and Wendricks deny that the Home Medication List containing the "at hour of sleep" notation was ever delivered from St. Vincent Hospital to BCJ, despite Dr. DeGroot's expectation that it would have been delivered. (Pl's Resp to Wendricks and Page's Proposed Findings of Fact ¶ 44, ECF No. 194.) However, the defendants have not attempted to explain any administrative errors, and the trial testimony of Nurse Wendricks and Officer Malueg suggests that they both adhered to a strict 5-12-5 Policy. Nurse

13

Wendricks testified that when he denied McIntosh's April 9 medical request, he was articulating BCJ policy as he understood it. (Trial Tr., 129:12-21, February 7, 2012, ECF No. 159.) Officer Malueg also testified that according to BCJ policy, officers could not administer "as needed" medications outside the hours of 5:00 a.m., 11:00 a.m., and 5:00 p.m. (Trial Tr., 251:9-22, February 8, 2012, ECF No. 160.) Thus, when the evidence is viewed in the light most favorable to McIntosh, a reasonable jury could find that a strict 5-12-5 Policy was a widespread custom at BCJ, and that this custom caused staff officials to refuse to administer McIntosh's pain medications according to his doctor's prescription, in violation of his Eighth Amendment rights. Given the number of officials involved and the length of the alleged deprivation of rights, it is reasonable to impute knowledge and acquiescence on the part of the Brown County Sheriff. Brown County's motion for summary judgment is therefore denied.

### B. Individual Capacity Eighth Amendment Claims

To prove a claim of deliberate indifference, "a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008) (internal citation omitted). An inmate's subjective belief that a different course of action would have been preferable does not constitute sufficient evidence of deliberate indifference to survive summary judgment. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005). In fact, even a difference of opinion between physicians is not enough to establish deliberate indifference. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Deliberate indifference requires more than negligence; it requires that the official knew of, yet disregarded, an excessive risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834-37 (1994). Subjective knowledge of the risk is required: "[A]n official's failure to

14

alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id*. at 838.

Although the Eighth Amendment does not apply to pretrial detainees, as a pretrial detainee McIntosh was entitled to at least the same protection against deliberate indifference to his basic needs under the Fourteenth Amendment as is available to convicted prisoners under the Eighth Amendment. *See Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) (citation omitted).

McIntosh contends that the pain he suffered throughout his stay and his post-operation infection constituted serious medical needs. To satisfy the objective element of the deliberate indifference test, a plaintiff must have a medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Edwards v. Snyder*, 478 F.3d 827 (7th Cir. 2007). McIntosh was prescribed pain medications by two physicians, but he contends that his medications were withheld on numerous occasions, including multiple evenings in the week following the surgery. Pain due to the withholding of medication has been found to constitute a serious medical need. *See Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999); West *v. Millen*, 79 F. App'x 190, 193 (7th Cir. 2003). In addition, McIntosh underwent surgery that required a six-inch incision in his scrotum, and even a lay person would recognize that McIntosh's post-operation infection would require medical care. Thus, the court is satisfied that McIntosh presented serious medical needs.

The court now examines whether any of the defendants may satisfy the subjective element—that is, whether they were aware of McIntosh's serious medical needs and were deliberately indifferent to those needs. In a § 1983 claim, a plaintiff may not rely on the doctrine of *respondeat superior*. "Liability depends on each defendant's knowledge and actions, not on the

knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009).

### 1. Dr. Mark Jenson and Nurse Pam Page

The HSU staff was mainly comprised of Dr. Mark Jenson and approximately three to five nurses, including Nurses Wendricks and Page. (PPFOF, ¶ 21.) Pursuant to a contract with Brown County, Dr. Jenson served as the medical director of the BCJ Health Services Unit ("HSU") from approximately 2004 to 2008. (*Id.* ¶ 11.) Jenson's contract provided that he would provide 24/7 on-call support, be responsible for the management of BCJ's medical services, and "assist the [Brown County Sheriff's Department] in developing and implementing policies and procedures that assure high quality health services." (Purchase of Service Contract § III, Blinka Decl., Ex. 39, ECF No. 198-39.) Dr. Jenson worked at BCJ approximately two hours per week, and while on-site, he visited with patients who had been triaged by the HSU nursing staff. (PPFOF ¶¶ 16-17.) Pam Page served as the manager of the nursing staff. (*Id.* ¶ 19.)

McIntosh contends that he had four appointments with Dr. Jenson and prior to each appointment, he met with Nurse Page and told her about all of the medical problems he was suffering at the time. McIntosh alleges that prior to and during his appointments on April 24 and May 22, 2007, he informed Page and Dr. Jenson that he was in severe pain but had been denied his pain medication at bedtime because of the 5-12-5 policy. He also contends that on August 7, 2007, he told Dr. Jenson that he was suffering pain and was not receiving adequate pads and ointment for his wound. He alleges Dr. Jenson told him that he would look into his problems, but the problems were never resolved. McIntosh supports these assertions with an affidavit submitted on September 20, 2013. (Decl. of Charles McIntosh, ECF No. 197.) Page and Dr. Jenson contend that the

affidavit is a "sham affidavit" because it contradicts his previous trial testimony. A party cannot create an issue of fact by submitting an affidavit whose conclusions contradict prior sworn testimony, unless the party can adequately explain the conflict. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1074-75 (7th Cir. 2012); *Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006).

At trial, McIntosh did not recall seeing Dr. Jenson on April 24, 2007, though he did not deny that the visit occurred. (Trial Tr., 435:24-436:9, February 8, 2012, ECF No. 160.) Page and Dr. Jenson also note that since McIntosh received his Vicodin at 9:00 p.m. until April 26 following his surgery, it is unlikely that McIntosh would have complained about that issue on April 24. On the other hand, it is possible that McIntosh could have reported the problems he experienced in early April. To be sure, the fact that McIntosh states in his more recent declaration that he told Dr. Jenson that he was not getting his medication as ordered when he saw him on April 24 is inconsistent with his trial testimony that he did not recall the visit. The apparent conflict may serve as a basis on which Dr. Jensen will be able to successfully impeach McIntosh at trial, but it is not the kind of contradiction that warrants application of the sham affidavit rule. McIntosh testified at trial that he did not recall the specific visit on April 24. But he also testified that every time he saw Dr. Jenson it was for serious medical needs and that he continued to have significant pain in his testicles particularly at night throughout May and thereafter. (*Id.* at 439:21-440:3, 441:13-442:2, 443:17-20, 444:1-11.) Dr. Jensen was not one of the defendants at the previous trial, and it therefore was not relevant whether he had complained to him about the policy.

The sham affidavit rule is an exception to the rule that conflicts in the testimony of a witness are to be resolved by the fact finder. The rule is only applied where the contradiction between the

earlier sworn testimony or statement and the later is clear and unmistakable that the court will strike a parties affidavit. *See Knauf Realty, LLC v. Prudential Real Estate Affiliates, Inc.*, 486 F.Supp.2d 855, 857 (W.D. Wis. 2007)("the sham affidavit rule is limited to blatant contradictions, not elaborations on ambiguous testimony that the other party failed to clarify during a deposition."). The court declines to apply it here. Even if the court applied it, it would remove from consideration only McIntosh's assertions concerning the April 24 visit. His trial testimony, while not as detailed, is consistent with the remainder of his declaration. This evidence provides enough support for McIntosh's allegations that Dr. Jenson was aware of the 5-12-5 policy and did nothing to address McIntosh's concerns. If true, his inaction could support a deliberate indifference claim. *See Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (finding that a doctor's refusal to administer pain medication prescribed by another doctor could constitute deliberate indifference). Dr. Jenson's motion for summary judgment is therefore denied.

Nurse Page argues that all of McIntosh's allegations against her in the affidavit should be stricken because of two additional contradictions. First, McIntosh claims he addressed a May 17 grievance to Dr. Jenson because Dr. Jenson was the director of the HSU and because Page told McIntosh that Dr. Jensen would receive a grievance addressed to his name. (Decl. of Charles McIntosh, ¶ 8, ECF No. 197.) At trial, McIntosh testified that he addressed the grievance to Dr. Jenson because "Dr. Jenson was the highest I could go within the medical unit," and that between Nurses Page and Wendricks, "none of my requests was really going nowhere." (Trial Tr., 367:3-12, February 8, 2012, ECF No. 160.) This is an unexplained contradiction and raises issues as to McIntosh's general credibility, but it does not directly address McIntosh's more pertinent allegation

that he informed Page about the denial of his pain medication before his visit with Dr. Jenson on May 22.

Nurse Page contends that this allegation should be stricken because at trial, McIntosh testified that he did not remember meeting with Dr. Jenson four times. (McIntosh Tr. Tran. 438:2-8, ECF No. 160.) Nurse Page observes that McIntosh "goes from not remembering if he even met with Dr. Jenson four times to now being able to recite the conversations that took place at these appointments." (Wendricks and Page Reply Br. at 9-10, ECF No. 205.) Like the absence of specific recollection of the April 24 visit with Dr. Jenson, this is not a direct contradiction. In fact, since McIntosh admitted at trial that he did not recall the April 24 visit, his additional statement that he did not recall meeting with Jenson four times is unremarkable. McIntosh's testimony did not distinguish the visits he recalled from the visits he had forgotten, and it did not address whether McIntosh recalled speaking with Nurse Page at any of his visits. Since Nurse Page was not identified as a defendant at that time, it is not surprising that McIntosh did not address her involvement. Nurse Page raises significant questions about the credibility of McIntosh's allegations, but a credibility determination is not appropriately resolved at summary judgment. Viewed in the light most favorable to McIntosh, the evidence indicates that McIntosh informed Nurse Page about the 5-12-5 Policy, but Nurse Page did not consult with Dr. Jenson, the nurses she supervised, or prison officials to resolve his problem. Such inaction could support a finding of deliberate indifference. *See Gayton v. McCoy*, 593 F.3d 610, 623-24 (7th Cir. 2010) (holding that a nurse's inaction, when there are clear indications of a serious medical need, may constitute deliberate indifference). Summary judgment will therefore be denied as to Nurse Page.

## 2. Nurse Norb Wendricks

McIntosh contends that Wendricks exhibited deliberate indifference by denying his medications at bedtime, stopping his medications altogether prior to his surgery, and failing to provide him with sufficient gauze and ointment to care for his surgical wound. Prison nurses may generally defer to instructions given by physicians, but they may not follow orders blindly, and they act with deliberate indifference if they ignore obvious risks to an inmate's health. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (internal citation omitted). As noted above, it is unclear whether Wendricks denied McIntosh his pain medication at bedtime based on a strict 5-12-5 Policy, a negligent error in the recording of Dr. DeGroot's prescription, or an exercise of his own discretion. This is a factual dispute, and for purposes of summary judgment, there is ample evidence from which a jury could find that Wendricks was deliberately indifferent to McIntosh's serious medical needs. In addition to denying pain medications at night, Wendricks inexplicably told McIntosh on April 11, 2007, that his prescription Darvocet had run out and that he would have to use Tylenol or ibuprofen instead. (Blinka Decl., Ex. 16, ECF No. 198-11.) On April 6, 2007, Dr. DeGroot had prescribed 30 pills plus one refill, and it does not appear that McIntosh's initial 30 pills would have been depleted before April 10. Wendricks offers no explanation for this apparent error.

This is not to say that Wendricks failed to assist McIntosh on other occasions. Wendricks helped McIntosh get an additional Vicodin prescription from Dr. Jenson when Dr. DeGroot's prescription ran out, and he personally removed McIntosh's sutures and provided him pads and ointment on occasion. Nevertheless, viewing the evidence in the light most favorable to McIntosh, summary judgment must be denied as to Nurse Wendricks. In so ruling, the court also rejects Nurse

Wendricks's argument that McIntosh's claim against him is barred by issue preclusion. The implicit effect of the court's order granting a new trial was to vacate the judgment in the defendants' favor entered on February 14, 2012. (ECF No. 123). A vacated judgment no longer has preclusive effect. *See, e.g.*, *Korczak v. Sedeman*, 427 F.3d 419, 422 (7th Cir. 2005) ("A vacated judgment is not a permissible basis for collateral estoppel").

### 3. Officer Ryan Malueg, Officer Misty Anderson, and Lieutenant Jesse Verdegan

McIntosh contends that these correctional officers knew of, contributed to, and failed to remedy McIntosh's serious medical issues. As nonmedical administrators, correctional officers are generally "entitled to defer to the judgment of jail health professionals," *Berry v. Peterman*, 604 F.3d 435, 440-41 (7th Cir. 2010), "except in the extraordinary case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment." *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002) (quoted in *Johnson v. Doughty*, 433 F.3d 1001, 1010-11, (7th Cir. 2006)); *see, e.g.*, *Hudson v. McHugh*, 148 F.3d 859, 863-64 (7th Cir. 1998) (finding that plaintiff stated an Eighth Amendment claim against correctional officers because they knew plaintiff was epileptic, knew he was not receiving his medication, and did nothing to remedy the situation). This rule supports the division of labor that is essential to effective prison management. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

On the evening of April 26, Officer Malueg deferred to the opinion of Nurse Wendricks, who informed Malueg that McIntosh was not allowed to receive his pain medication at bedtime. This satisfied Officer Malueg's obligation, as the facts presented here do not make this an unusual or extraordinary case. Unlike the plaintiff in *Hudson*, McIntosh was receiving his Vicodin following surgery three times a day. It would not have been evident to a layperson that McIntosh

was receiving inappropriate treatment because he was denied medication at night, especially if the layperson did not have direct access to McIntosh's prescription instructions or medical file. Officer Malueg testified that he lacked access to inmates' medical files, so he was forced to rely on the instructions of the HSU nurses. (Trial Tr., 260:9-12, February 8, 2012, ECF No. 160.) McIntosh also contends that he asked Officer Malueg for Vicodin at bedtime every night from April 27 to April 30. (PPFOF ¶¶ 78-79.) Officer Malueg denies this assertion, but even if it is true, there is still no basis for personal liability. Nurse Wendricks reportedly told Officer Malueg on April 26 that "McIntosh is only allowed to get his vicodin at the three med times listed above as needed and no other times will he be allowed to get them." (Blinka Decl., Ex. 29, ECF No. 198-18.) Thus, according to Officer Malueg entry in the Inmate Notebook, Nurse Wendricks made a definitive statement and did not advise Malueg to check with him again. If Officer Malueg relied on that statement again in the following days, he would still have been deferring to the judgment of the medical staff. Summary judgment is therefore granted as to Officer Malueg.

Officer Anderson and Lt. Verdegan's only involvement was to deny McIntosh's April 27 grievance concerning Officer Malueg and Nurse Wendricks's refusal to give him Vicodin at bedtime. A complaint examiner generally cannot be held liable for rejecting an administrative complaint about a "completed act of misconduct." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). However, this principle should not preclude liability against a complaint examiner who turns a blind eye to a constitutional violation and rejects a complaint related to an *ongoing* act of misconduct. *See Burks*, 555 F.3d at 595 (7th Cir. 2009) (explaining that a complaint examiner may be liable if he refuses to do his job and leaves "prisoners to face risks that could be averted by faithful implementation of the grievance machinery."); *Miller v. Wisconsin Dep't of Corr.*, No. 08-

62, 2008 WL 2563154, at *3 (W.D. Wis. Apr. 22, 2008) (distinguishing *George* where petitioner alleged the defendants had rejected his complaints related to an ongoing act of misconduct—the continued withholding of necessary medical treatment). Here, McIntosh's grievance indicated that the denial of his medication contravened Dr. DeGroot's "as needed" prescription. As a result, although McIntosh only mentions one prior incident, a reasonable reading suggests that McIntosh's issue will likely continue into the future.

Like Officer Malueg, Officer Anderson contacted an HSU nurse regarding McIntosh's complaint. Nurse Sarah essentially articulated the "as needed" medication policy articulated by Nurse Page, advising that if McIntosh needs pain medication at night, he should again speak to the correctional officer in his pod, who will follow up with HSU. (Blinka Decl., Ex. 31, ECF No. 198-20.) Given the circumstances, Officer Anderson's conduct was reasonable. She contacted the HSU medical staff and relayed the nurse's advice to McIntosh. Accordingly, summary judgment is granted as to Officer Anderson.

Lt. Verdegan upheld Officer Anderson's ruling, stating that "[t]he procedure of the Brown County Jail is med passes are at 5am, 12pm, and 5pm. These are not subject to change. The Dr.'s order says you get meds at 5pm not 9pm. There is nothing we can do to change this." (Blinka Decl., Ex. 32, ECF No. 198-21.) Since it is unclear whether Lt. Verdegan contacted HSU, Lt. Verdegan's response is not entitled to the same deference afforded to Officer Malueg and Officer Anderson's responses. It appears that either Lt. Verdegan contacted HSU and received incorrect information, or he failed to minimally investigate the complaint. Dr. DeGroot's instructions indicated that McIntosh could receive Vicodin every four hours, as needed; the instructions did not say that McIntosh can receive his medication at 5:00 p.m. but not 9:00 p.m. Absent any further

23

explanation from Lt. Verdegan, there is sufficient evidence from which a jury could conclude that he was deliberately indifferent to McIntosh's serious medical needs. Summary judgment is denied as to Lt. Verdegan.

### 4. Captain John Jadin

As explained above, McIntosh has not presented evidence that Captain Jadin authored the 5-12-5 Policy, but McIntosh also contends that Jadin had personal knowledge of his April 27 grievance and ignored the issue. BCJ's grievance policy provided that prior to filing a grievance, the inmate must attempt to resolve the issue informally by speaking with a correctional officer. If the issue cannot be resolved informally, the inmate must submit a formal request to the Housing Corporal. If dissatisfied with the Housing Corporal's response, the inmate may file a formal grievance with the Jail Lieutenant or his or her designee. Finally, if the grievance is denied by the Jail Lieutenant or his or her designee, the inmate has 48 hours from receipt of the denial to appeal the grievance to the Jail Administrator. (Brown County's Resp. to Pl's Interrogatories at 4, Johnson Aff., Ex. B, ECF No. 184-3.) McIntosh contends that as to his April 27 grievance, he pursued and complied with the requirements for every level of appeal. He claims that as a final step, after receiving notice that Lt. Verdegan denied his grievance, he mailed a letter to Captain Jadin.

Captain Jadin testified that he was unaware of McIntosh during his stay at BCJ and does not recall receiving a letter from him. (Jadin Dep. 50:19-51:21, Blinka Decl., Ex. A, ECF No. 198-38.) The general presumption is that a properly addressed, stamped, and mailed letter was received by the addressee. *See In re Longardner & Assocs., Inc.*, 855 F.2d 455, 459 (7th Cir. 1988). McIntosh testified that he mailed the letter through the U.S. postal service, although he has not provided a copy of the letter or produced any other evidence that it was sent. (Trial Tr., 377:20-23, February

24

8, 2012, ECF No. 160.) There is also evidence in the record indicating that McIntosh did not always follow BCJ's procedures for sending mail. On April 27, Officer Malueg wrote in the Inmate Notebook that McIntosh turned in a letter that did not have a proper return address and had writing all over the envelope. When Malueg told him that BCJ would not send the letter unless he fixed these errors, McIntosh allegedly told him that "he will just turn it in to someone else then." (Blinka Decl., Ex. 29, ECF No. 198-18.) However, the fact that McIntosh pursued his appeal at each previous stage supports his claim, and given his status as a prisoner, his testimony that he sent the letter is sufficient to create an issue of fact as to whether Captain Jadin in fact received it. If Jadin received the letter but ignored it, a reasonable jury could find that he acted with deliberate indifference. *See Berry*, 604 F.3d at 440 (finding that the jail administrator was entitled to defer to the judgment of medical professionals "so long as he did not ignore [the inmate]"). Thus, summary judgment must be denied as to Captain Jadin.

### C. Qualified Immunity

All individual defendants except for Dr. Jenson raise qualified immunity as a defense. Qualified immunity protects government officials from civil liability when performing discretionary functions so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome the defense of qualified immunity, the plaintiff "must first allege the deprivation of an actual constitutional right, and second, show that the right was clearly established at the time of the alleged violation." *Alvarado*, 267 F.3d at 652. Here, none of the defendants are entitled to qualified immunity. The general standard for "denying or delaying access to medical care or intentionally interfering with

the treatment once prescribed" has been well-established since *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), and the application of that standard to pain medication was also well-established at the time of these events. *See Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (finding that guard's refusal to administer pain medication when requested was a "gratuitous cruelty"); *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (denying qualified immunity on claim that nurse refused to administer plaintiff's "as needed" pain medication). Factual disputes preclude finding that any of the remaining defendants acted in good faith.

## IV. CONCLUSION

Accordingly, and for the reasons set forth above, the defendants motions for summary judgment are **GRANTED** as to defendants Ryan Malueg and Misty Anderson. Summary judgment is **DENIED** as to the official capacity claim against Brown County, and the individual capacity claims against John Jadin, Norb Wendricks, Pam Page, Mark Jenson, and Jesse Verdegan. The John and Jane Does referenced in McIntosh's complaint have not been identified and will be dismissed. The Clerk is directed to set this matter on the court's calendar for a Rule 16 conference so a new trial date can be set .

**SO ORDERED** this __18th__ day of March, 2014.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court